UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| The VILLAGE OF BROADVIEW, an Illinois Municipal Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 25 C 12164 |
| v. | ) ) | Judge Hunt |
| The U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

### Introduction

After violence, threats of additional violence, and organized interference with the work of federal immigration enforcement, the Department of Homeland Security erected a temporary fence around the "Broadview Service Staging Area" where arrested immigrants are processed. The fence is there to protect people and property and to prevent interference with law enforcement. The Village of Broadview objects to the fence on grounds that, because it blocks the street, it could interfere with fire and other emergency services and is therefore a trespass and public nuisance. The court should deny Broadview's motion for an injunction because—among other reasons—DHS has the inherent authority to protect property as well as statutory authority to protect federal facilities. *See, e.g.,* 40 U.S.C. § 1315 and 19 U.S.C. § 1589a(3). The Supremacy Clause mandates preemption where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and citations omitted).

## Background

The Department of Homeland Security operates a facility at 1930 Beach Street in Broadview, Illinois, that it uses for the intake and processing of individuals arrested by U.S. Immigrations and Customs Enforcement and U.S. Customs and Border Protection. Ex. A (Hott Decl.) ¶ 8. The site has been operative for more than 40 years and sits near the dead-end of a cul-de-sac. *Id*. DHS vehicles (and Broadview ambulances and most fire trucks) can enter Beach Street from the other side of the fence through an existing gate. The gate on the fence in question is 16 feet wide. *See* Decl. of Acting Broadview Fire Chief Martin, Dkt. 10-3, ¶ 6.

The fence that DHS erected on Beach Street on the night of September 22-23, 2025, has little to no impact on commercial traffic. Ex. A (Hott Decl.) ¶ 8. The closest business, which occupies two buildings on Beach Street, has separate ingress and egress not impacted by the fence. *Id*. The building across the street from DHS's facility is vacant. *Id*. And the area around the facility is zoned commercial or industrial, so the street does not see residential traffic. *Id*.

Since the first week of September 2025, rioters and protesters have targeted the DHS facility and its employees. *Id*. ¶ 9. The protests interfere with immigration operations throughout the region, because the facility is the only intake-and-processing facility in the area. *Id*. Early on, protesters blocked access to the facility and physically assaulted DHS employees attempting to go to or leave work. *Id*. ¶ 10. Employees who parked in the facility's open lot had to call the facility's office on arrival so that four officers could come out to escort them into the building. *Id*. Vandals slashed the car tires and in at one instance poured flour into a gas tank. *Id*. This resulted in DHS employees parking farther away from the facility, requiring DHS to send a van to retrieve them and resulting in multiple attacks on the van by protesters. *Id*. Moving cars traveling to the facility were also attacked more than a dozen times: a protester would jump on the hood of a car, another

would stand immediately behind the car, and when the car came to a stop others would slash the tires. *Id*. Indeed, this attack was perpetrated on DHS's declarant's car. *Id*.

Protesters also caused property damage in the form of graffiti on the facility, the facility's flagpole, and nearby surfaces and signs. *Id*. ¶ 12. Protesters also damaged the facility's exterior plumbing system. *Id*.

Most troubling of all has been the increase of physical assaults on DHS employees, including non-officer employees. *Id*. ¶ 14. Protesters have hit and punched officers on several occasions, and the assaults became more significant and more violent as the size of the crowds grew from a handful of people in early September to more than 300 immediately before DHS erected the fence on the night of September 22-23. *Id*.

The weekends of September 12-14 and 19-21 were particularly violent: protesters threw bottles, rocks, and tear gas cannisters at officers. *Id*. ¶ 16. During the second weekend, DHS found a round, green ball with a wick that the Bureau of Alcohol, Tobacco, Firearms, and Explosives identified as an improvised explosive device. *Id*. ¶ 19. Some of the agitators appear to be organized: they arrive by van and are regularly collected by van and replaced by reinforcements, and they come armed with shields, gas masks, and tools indicating that they are prepared or expecting to physically engage with law enforcement. *Id*. ¶ 21.

The attempts to harm officers have been successful: more than 30 officers have been injured during the assaults on law enforcement, including multiple hospitalizations. *Id*. ¶ 22. At least one officer was followed home from the facility and aggressively confronted there, and 10 days later his garage was broken into and his government-owned vehicle was broken into and damaged. *Id*. ¶ 23.

DHS took steps to respond to the violence as the facility's staff became increasingly overwhelmed. *Id*. ¶ 24. Beginning around September 8, Special Response Team officers—who

are trained to serve in high-risk situations—began staffing the facility in 12-hour shifts. *Id*. These officers created paths for DHS vehicles and pushed crowds away from the facility as rioters threatened violence. *Id*. DHS solicited assistance from additional Special Response Team officers on at least 25 occasions given the escalating risks, including an anticipated crowd of 800 protesters scheduled for September 19-20. *Id*. ¶¶ 25-26. DHS also installed lights around the facility's perimeter to improve visibility at night. *Id*. ¶ 27.

In the first days of the protests, when the crowds were small, Broadview's police were present and made a small number of arrests. *Id*. ¶ 28. But the police did not return after the publication of an article criticizing their presence. *Id*. DHS called for help from the Broadview police more than eight times on September 12-13, but the police responded that they had been directed not to respond to such requests for help (but that they would respond to requests from protesters). *Id*. ¶ 29.

Following the Broadview police's disengagement and before DHS erected the fence, local police did not assist in controlling protests; rather, DHS and its federal partners were solely responsible for controlling the violence outside the facility, including on municipal property. *Id*. ¶ 30. DHS has arrested around 50 individuals for assault, obstruction, trespassing, and other charges. *Id*. Three individuals arrested on September 26-27 were carrying concealed semi-automatic weapons. *Id*.

After three weeks of unrest, DHS made a push to move the agitators down the street and away from the facility on the night of September 22-23, and at midnight a contractor erected an anti-climb fence. *Id*. ¶ 31. The fence is rented and is not permanent. *Id*. ¶ 32. The fence's presence allows vehicles to freely leave the facility and its parking lot. *Id*. ¶¶ 32-36. Broadview has told DHS that the fence has resulted in fewer 911 calls for emergency assistance to the area. *Id*. ¶ 36. The fence has also resulted in a significant decrease in officer injuries, because agitators are no

longer able to make direct contact with DHS employees. *Id*. The fence has received positive support from the local businesses on Beach Street. *Id*.

On October 2, the Illinois State Police established a protest zone and placed concrete barriers on Beach Street, creating a restricted area for which the fence serves as one boundary. *Id*. ¶ 37. The ISP also maintained security in the area on October 3. *Id*. They did not manage the area on October 4-5, but they did respond to DHS's repeated requests for assistance on both days. *Id*.

Should the fence be moved, DHS anticipates that violence against officers will resume, and that DHS and its federal partners would be forced to increase uses of force in the absence of Broadview's managing and controlling the protests on its own. *Id*. ¶ 38. A risk of increased violence would threaten DHS employees, local businesses, and detainees. *Id*. ¶ 39.

**Argument**

Broadview is not entitled to emergency relief. All four factors that courts analyze when considering whether to enter a preliminary injunction tilt in DHS's favor. Broadview's motion does not show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, or that an injunction would be in the public interest.

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). (The court should exercise its discretion to convert Broadview's request for a temporary restraining order into a motion for a preliminary injunction, because defendants are "on notice of the request" and have had "an opportunity to respond." *Norfleet v. Illinois Dep't of Corr.*, 2017 WL 2623946, *2 (S.D. Ill. May 4, 2017) (citing *Doe v. Village of Crestwood, Illinois*, 917 F.2d 1476, 1477 (7th Cir. 1990)).)

To succeed on a motion for a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Bevis*, 85 F.4th at 1188 (quoting *Winter*, 555 U.S. at 20). For the first factor, the movant must make a "strong" showing that reveals how it proposes to prove its case. *Id*. For the second factor, a "mere possibility" of irreparable harm "will not suffice." Finally, when the government is the opposing party, the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Colorado v. DeJoy*, 487 F.Supp.3d 1061, 1064 (D. Colo. 2020) (same when both parties are government entities). Broadview cannot satisfy these requirements.

## I.      Broadview Is Not Likely to Succeed on the Merits.

Broadview is not likely to succeed on the merits of its case against DHS, because DHS has the statutory right to protect its facilities, including in areas outside its property if necessary. Broadview alleges that DHS has exceeded its statutory jurisdiction on the ground that the Immigration and Nationality Act, 8 U.S.C. § 1101, gives DHS certain powers to arrest, detain, and remove noncitizens but does not give DHS the power to commandeer municipal property. Omitted from Broadview's motion is any mention of DHS's inherent authority to protect its property. Additionally, 40 U.S.C. § 1315 grants DHS authority to cross-designate law enforcement officers to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property." 40 U.S.C. § 1315(a). This cross-designation includes *"duty in areas outside the property* to the extent necessary to protect the property and persons on the property." 40 U.S.C. § 1315(b)(1) (emphasis added).

Broadview says that the Administrative Procedure Act allows them to sue. That is not accurate. But even if that were true, Broadview's underlying argument that state law causes of

action such as trespass prevent DHS from putting a temporary fence on the street in front of its facility conflicts with federal law. As demonstrated by weeks of increasingly disruptive, violent, and dangerous protests and riots, operating without the fence frustrates ICE's and CBP's implementation of the Immigration and Nationality Act. State laws cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). State laws are invalid if they "either frustrate[] the purposes of the national legislation or impair[] the efficiency of th[o]se agencies of the federal government to discharge the duties[,] for the performance of which they were created." *Davis v. Emira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("If the purpose of the [federal law] cannot otherwise be accomplished—if its operation within its chosen field must be frustrated and its provisions be refused their natural effect—the state law must yield.") (citation omitted).

Another reason Broadview is unlikely to succeed on the merits is that its claims are not ripe for review. "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (citation omitted). Here, the uncertain nature of the ongoing controversy is shown in Exhibit 5 to Broadview's motion, a September 26, 2025 letter from ICE's acting director to Broadview's mayor. Dkt. 10-5. The acting director writes that ICE has "repeatedly requested assistance from state and local law enforcement, including your own police department," to address "violence," "unlawful activity by rioters," "chants of 'shoot ICE,'" and "physical attempts to breach the Broadview facility." *Id*. He adds that the fencing on Beach Street "would not be necessary" if ICE's officers "were provided the support they need." *Id*.

The upshot is that the various law enforcement entities with interests in securing peace around the Broadview facility should be allowed more time to work together to develop solutions

before interference by the judiciary.  Indeed, on October 3—the very day Broadview filed this lawsuit—the Illinois State Police and "a handful of local police officers" apparently began handling crowd control near the Broadview facility for the first time.  Mohammad Samra, *et al*., *Star Power, State Police, and a Simmering Standoff*, Chicago Sun-Times, Oct. 4, 2025, at 6.  The state police reportedly closed off another street, not just Beach Street, to control the protest.  *Id*. Meanwhile, the Illinois Attorney General issued a statement "defend[ing] the use of state police to oversee protests" at the Broadview facility.  *Id*. at 7.  Moreover, the day before, "local and state authorities" reportedly "installed new barriers creating 'designated protest areas' that were off the street."  *Id*. at 6.  The point is that law enforcement from all levels of government are continuing to come together to address a volatile situation, and until that volatility is resolved, Broadview's claim is unripe.

Temporary blocking of public ways by law enforcement—federal, state, or local—is hardly unprecedented.  When there is danger or when necessary to accomplish law-enforcement needs (for example, during execution of arrest warrants, search for criminal suspects, fire, accident, etc.) public ways are often blocked to general traffic by law enforcement while allowing emergency vehicles through.  What is happening in Broadview may differ in degree but not in kind from what can happen at any crime scene: a temporary securing of the street to protect persons and property and to permit federal law enforcement and emergency vehicles to pass.

Analyzing the complaint's counts one by one, as we do below, results in the same conclusion.

### A.      Torts (Trespass and Public Nuisance)

Counts I and II purport to bring common law claims for trespass and public nuisance against the federal defendants.  Compl. (Dkt. 1) ¶¶ 74-92.  Such state-law claims have no merit. Broadview says it "cannot seriously be disputed" that DHS is trespassing on Broadview property.

Mot. (Dkt. 10) at 4. But they do not cite a single case in which a court entered a preliminary injunction against the federal government for an alleged trespass. Trespass is a tort, and the Federal Tort Claims Act waives sovereign immunity from state law tort suits for *damages* claims only. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012). An injunction based on a state law tort would violate sovereign immunity. Nuisance is also a tort, and while *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, (1938), held that "[t]here is no federal general common law," "it did not close the door on federal common law entirely." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 770 (7th Cir. 2011) (citing *American Electric Power,* 131 S.Ct. at 2535–37). But there is no need for a federal common law of nuisance under the facts of this case. As the court explained in *Michigan,* federal courts "fill in 'statutory interstices,' and, if necessary, even 'fashion federal law' " in areas " 'within national legislative power,'" such as "in the context of interstate nuisances "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism." *Id.* Those concerns are not present here, and moreover, Congress *has* legislated in this context, permitting DHS to protect federal property even if it has to go onto non-federal property to do so.

### B.  APA – Act Allegedly in Excess of Statutory Jurisdiction

Count III purports to bring a claim under the APA on the ground that DHS has allegedly acted in excess of its statutory jurisdiction. Compl. (Dkt. 1) ¶¶ 93-112. First, the APA cannot be used to challenge DHS's placement of fence to protect its property. Even if the APA could be relied upon, one of that claim's fatal flaws is simple: as explained above, DHS has inherent authority to protect its property and has cross-designated officers and agents to protect its property, including on public streets if necessary. *See generally,* 40 U.S.C. § 1315; INA generally.

### C.       APA – Act Allegedly Contrary to Constitution

Count IV purports to bring a claim under the APA on the ground that DHS has allegedly violated the Fifth Amendment by depriving Broadview of property without due process.  Compl. (Dkt. 1) ¶¶ 113-122.  Broadview seems to view the lack of due process as manifesting in the form of DHS's alleged failure to "seek a permit to construct this fence."  Mot. (Dkt. 10) at 7.   But Broadview cannot require the federal government to obtain a permit in order to do what it deems necessary to protect federal property and those who work there from harm.  *Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state.").  And it is hard to imagine that Broadview would require other law-enforcement agencies to apply for a permit to block a street where there was a violent public disruption or where there were other crimes in progress.

### F.       APA – Alleged Failure to Observe Required Procedures

Count V purports to bring a claim under the APA on the ground that DHS has allegedly failed to observe required procedures.  Compl. (Dkt. 1) ¶¶ 123-128.  Broadview devotes barely a sentence to this argument in their motion, *see* Mot. (Dkt. 10) at 8, so the argument can be deemed waived or forfeited.  *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (perfunctory and underdeveloped arguments are waived); *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("underdeveloped arguments are waived").  Indeed, Broadview does not even attempt to explain what agency rulemaking procedures it thinks were violated or might have been violated.

### G.       APA – Alleged Arbitrariness and Capriciousness

Count VI purports to bring a claim under the APA on the ground that DHS's alleged refusal to remove the temporary fence is arbitrary and capricious.  Compl. (Dkt. 1) ¶¶ 129-135.  As explained above, DHS faced increasingly pervasive violence and threats of violence against its

employees in the weeks leading up to September 22-23. Its decision to quell the violence by erecting a temporary fence on Beach Street cannot reasonably be viewed as arbitrary and capricious in light of that escalating violence, particularly when the violence ebbed following the erection of the fence.

### H. Alleged *Ultra Vires* Act

Count VII purports to allege that DHS's maintenance of the temporary fence is *ultra vires*. The phrase means, "in layman's terms, beyond [one's] legal authority." *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 728 (7th Cir. 2020). But again, as explained above, DHS has inherent authority to protect its property and has cross-designated officers and agents to protect its property, including on public streets if necessary. 40 U.S.C. § 1315.

## II. No Showing of Irreparable Injury

Broadview has not made a showing of any irreparable injury arising out of the fencing that restricts access to a portion of Beach Street. To the contrary, it is DHS, its employees, nearby business and their employees, detainees, and the protesters themselves who face the prospect of irreparable injury should the court enter an order enjoining it from maintaining the fencing that protects the Broadview facility. The court can take notice of the fact that, at a similar facility in Dallas on the day after the temporary fence in Broadview was put up, a gunman targeting ICE agents by firing indiscriminately into a closed van, killed two individuals in ICE custody instead. Jazmine Ulloa, *Second Victim of Dallas ICE Shooting Dies*, New York Times, September 30, 2025. DHS and the public will as a matter of law suffer irreparable injury if it is prevented from doing so. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (brackets in original, citation omitted).

11

Broadview urges that, absent an injunction, "there is simply no other remedy at law that could abate the[] harms" caused by the temporary fence. Mot. (Dkt. 10) at 9. But the Federal Tort Claims Act at least conceivably presents a remedy at law for a victim of a trespass by the federal government. *Hatahley v. United States*, 351 U.S. 173, 181 (1956). (Broadview would probably not have such a remedy under these particular facts for several reasons, but that question is not before the court here. The whole point is that DHS has the authority to do what it did here, with one result being that Broadview has no "remedy" to stop it.)

Broadview cites *Texas*, 123 F.4th at 212, for the proposition that irreparable injury exists and injunctive relief is appropriate "where a tort claim seeks to stop a continuing trespass to land." Mot. (Dkt. 10) at 9. But as explained, the Federal Tort Claims Act is the sole vehicle through which a party can sue the United States in tort, and the only relief available is money damages, not an injunction.

Broadview also cites *California*, 2025 WL 1711531, at *4, for the proposition that a state can establish irreparable harm if it is "forced to agree" to "unlawful and unconstitutional" conditions where the alternative is losing "billions of dollars in federal funding." Mot. (Dkt. 10) at 9. Broadview cites the letter from ICE's acting director as evidence of supposedly analogous extortion, but there is no extortion: DHS has acted under its statutory authority to protect its facility in part because Broadview has not kept the peace in the area. The letter simply explains that, if Broadview is able to keep the peace, then the temporary fence will be unnecessary.

### III.    Balance of Equities and Public Interest

For the same reasons, the balance of equities tips in DHS's favor, and the public interest favors allowing DHS to protect its facility. Broadview says that the balance-of-equities analysis favors the moving party when the likelihood of success on the merits is strong, which is true, but here, Broadview's likelihood of success on the merits is weak, so the analysis cuts the other way.

12

Likewise, Broadview says there is no public interest in "unlawful agency action," Mot. (Dkt. 10) at 10, but as explained above, DHS's actions here are not unlawful. Broadview says that "there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. (quoting *Texas*, 123 F.4th at 213). That is exactly why the public interest here favors DHS. Broadview urges that the public interest favors its ability to have control over its own streets, but the public interest favors even more allowing DHS to protect its property, its employees, its detainees, and the public from violence. Broadview urges that the public interest "is protected by ensuring that the actions taken by federal agents to enforce immigration law do not unnecessarily intrude into the rights of countless property owners." Mot. (Dkt. 10) at 10. But there do not appear to be "countless" property owners at issue here. Google Maps indicates that there are *two* buildings south of the temporary fence, neither of whose owners appear to be complaining (at least based on the silence in Broadview's complaint and motion), and neither of which is *actually*—as opposed to *hypothetically*—being deprived of emergency services.

Aside from an abstract "equity" that Broadview alludes to in terms of its interest in control of the streets, a cursory overview shows that the real-world balance of equities favors permitting DHS to keep the fence in place temporarily to prevent injury or death, not to mention to prevent obstruction of law enforcement. The *theoretical* harm that Broadview alleges is that there are private facilities just south of the fence that could catch fire or otherwise require emergency services. That remote possibility can hardly outweigh the actual, daily harms that were occurring without the fence and that are easily understood to recur if the fence were removed. Moreover, the potential harm that might occur if a fire or health emergency occurred beyond the fence is a strawman. Authorized vehicles can pass through the 16-foot-wide gates of the fence at all hours. That's how some DHS and emergency vehicles enter and leave the facility. There is simply no

reason to believe that Broadview personnel would be impeded if they needed access. There is also an alternate route used by business owners and ICE personnel who park in the lot adjacent to the facility. Broadview will simply not be able to demonstrate any significant delay in access to the buildings south of the temporary fence. The balance clearly favors keeping the temporary fence in place.

## IV. Narrow Tailoring for Any Injunctive Relief

If the court were to enter an injunction (it should not), any injunction should be narrowly tailored to permit DHS to protect its facility. Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (injunction should not provide "a remedy beyond what [is] necessary to provide relief"). The court could, for example, direct that the temporary fence's gates continue to be staffed 24/7 with enough manpower to open them on demand should an emergency such as a fire require it. (Again, there is an alternative route for all but perhaps the largest ladder fire truck anyway.) Most critically, any injunctive order should also clarify that it does not prohibit DHS from protecting federal property in the face of threats.

## V. Stay Pending Appeal

Finally, if the court were to award injunctive relief (again, it should not), defendants request that any relief be stayed pending the disposition of any appeal authorized by the Solicitor General. At a minimum, defendants request that any relief be stayed for seven days to allow defendants to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## Conclusion

For the above reasons, the court should deny Broadview's request for injunctive relief.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ _____
    THOMAS P. WALSH
    ALEX HARTZLER
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    (312) 353-5312
    thomas.walsh2@usdoj.gov
    alex.hartzler@usdoj.gov

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

|  |  |
|---|---|
| The VILLAGE OF BROADVIEW, an Illinois Municipal Corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>The U.S. DEPARTMENT OF HOMELAND SECURITY, *et al*.,<br><br>*Defendants*. | No. 1:25-cv-12164<br><br>Declaration of Field Office Director Russell Hott |

**DECLARATION OF FIELD OFFICE DIRECTOR RUSSELL HOTT**

I, Russell Hott, hereby declare as follows:

1. I am employed by the United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the ERO Chicago Field Office. This includes oversight of ICE's Broadview Processing Center (BSSA), in Broadview, Illinois. I have held this position since August 2025.

2. Beginning in the fall of 2024, I served as the Acting Executive Associate Director (EAD) for ERO. In that role, I oversaw the operations of more than 7,600 ERO employees in field offices, at headquarters, and overseas. ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 170 countries around the world. I previously served as Deputy EAD from January 2024. I began my service with the U.S. Government as a detention enforcement officer with the

former Immigration and Naturalization Service in New York, New York in 2000. I have held the following positions with ICE: Assistant Director for Enforcement and Custody Management, Field Operations, and Enforcement Divisions, FOD for the Washington Field Office, Deputy FOD for the Boston and Washington Field Offices, Chief of Staff for the ICE Deputy Director, acting Deputy Assistant Director for Domestic Operations – Western Operations, and Unit Chief in the Removal Division.

2. As the FOD for ERO Chicago, I direct and oversee ICE's enforcement of federal immigration laws in the states of Illinois, Indiana, Wisconsin, Kansas, Kentucky, and Missouri.

3. The Chicago Field Office has approximately 180 officers covering six states across two time zones. In the City of Chicago and its immediate environs, ERO has approximately 65 officers, including 31 at BSSA.

4. This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (TRO) and sets out the current conditions on the ground at BSSA with respect to immigration enforcement operations and the security of ICE personnel and property. I have reviewed Plaintiffs' application for a TRO and supporting exhibits.

5. The statements contained in this declaration are based upon my personal knowledge, and information made available to me in the course of my official duties.

**Background**

6. ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service

and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

7. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

8. The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying

aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**Earlier Protests at BSSA and Impact on ICE Operations**

8. BSSA, located at 1930 Beach Street, in Broadview, Illinois, is an ICE-owned property used to intake and process individuals arrested by ICE and Customs and Border Protection (CBP) for appropriate administrative or criminal action. The building sits near the intersection of Beach and Harvard Streets in Broadview. BSSA – which has been at this site for more than 40 years – is near the dead-end of a cul-de-sac. The fence erected on the night of September 22-23, has little to no impact on commercial traffic. The closest business, which occupies two buildings on the street, has separate ingress and egress not impacted by the fence; other vehicles can also use this route. The building across the street from BSSA is vacant. The area around BSSA is zoned commercial and/or industrial, so the fence does not impact any residential traffic.

9. Since the first week of September 2025, violent opportunists, rioters, and protesters have targeted BSSA and its employees. Because this facility is the only one in the area that serves as an intake and initial processing facility for ICE, protests at this location interfere with immigration operations throughout the region, including ICE's targeted operations against criminal aliens.

10. Early on, protesters, among other things, blocked all means of ingress and egress at BSSA and physically assaulted personnel – law enforcement and non-law enforcement alike – who were attempting to go to and leave work. Employees, who parked in an open

lot, had to call the office when they arrived, so four officers could come out and escort them into the building. These "security details" retraced their steps when the employees departed. Vandalism of the cars in the lots became common, with tires slashed and flour poured in a gas tank. Both government- and personally owned vehicles were targeted. As a result, ICE employees would park further from BSSA, and ERO would have to send a van, which was attacked by protesters on multiple occasions, to retrieve them. Moving cars were also vandalized. In an attack that was repeated more than a dozen times, one protester would jump on the hood of a vehicle, and another would stand immediately behind the vehicle. While the driver stopped the car in the face of these obstacles, others would run up to the car and slash the tires. My own tires were slashed in this fashion.

11. Not only ICE personnel were impacted. Protesters accosted employees of nearby businesses, mistaking them for ICE employees. At least one of these employees also had their personally owned vehicle vandalized.

12. Property damage was significant, with graffiti (largely spray paint and permanent marker) on the building, concrete surfaces, signs, and the flagpole. The vandalism has included, in multiple locations: "F*CK ICE." BSSA's external plumbing systems were destroyed by the violent agitators when they broke off plumbing and downspouts. It has not yet been repaired, exposing the building to damage during inclement weather.

13. As threats, violence, and obstruction of operations increased, ERO Chicago was required to respond to increased threats and assaults on its officers and offices at BSSA. ERO Chicago has leveraged the depth and breadth of its law enforcement authorities in response to acts of violence or aggression impacting its mission. This has included criminal arrest of protesters for trespass and assault, including of ICE personnel.

14. Most troubling has been the sharp increase in physical assaults on personnel, including employees who are not law enforcement officers. On several occasions, officers have been hit and punched by protesters at BSSA. As the size of the crowds at BSSA has grown from a mere handful of people in early September to more than 300 immediately before the fence was erected on the night of September 22-23, 2025, the assaults became more significant and the clashes more violent.

15. Starting in early September, rioters shot fireworks at officers stationed outside BSSA. This has the potential to cause burns, blindness, and more significant injury, depending on the distance at which the firework explodes.

16. The weekends of September 12-14 and 19-21 were particularly violent. Rioters threw bottles and rocks at officers, and even canisters of 2-chlorobenzylidene malononitrile (also known as CS gas). CS is a form of tear gas generally used for riot control. Under Illinois Criminal Code of 2012, no person shall knowingly manufacture, possess, deliver, sell, purchase, carry, use, or employ in any manner any tear gas weapon or chemical weapon or device, unless issued a permit for commercial use from the Illinois Department of Professional Regulation.

17. At the same time, rioters would attempt to pull off officers' masks. When ERO fired its own CS canisters into the violent crowd, protesters would throw them back. When in scuffles, protesters would attempt (and sometimes succeed) to pull gear, such as gas masks or CS canisters, off officers' uniforms.

18. Because the larger and more aggressive crowds of protesters made safe access to BSSA increasingly difficult, ERO Chicago used more than $100,000 worth of less lethal munitions and chemicals for crowd control in the two weeks spanning from September 6,

2025, to September 20, 2025. ICE has never needed to use such munitions at this location previously in over forty years.

19. Over the weekend of September 19-21, 2025, ERO discovered a round, green ball with a wick at the perimeter. Its purpose was unclear, but in an abundance of caution, ERO contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives, which labeled it an Improvised Explosive Device and removed it from the scene.

20. It is clear that protesters have sought to permanently maim ERO personnel. When standing close to officers, rioters have used "Aztec Death Whistles," which sound like a human screaming and are generally 100-110 decibels in volume. They have also used bullhorns. At close quarters, either could cause long-term or even permanent hearing loss. Rioters have also shone strobe lights and lasers in offers' faces, risking their sight.

21. It is also clear that these rioters are organized. They appear to gather offsite, as they are brought in in vans. After several hours, the vans return with new protesters and take the people who have been outside for several hours away with them. When they arrive, rioters are armed with shields, gas masks, protective padding, and other tools that indicate that protesters are prepared or expecting to physically engage with Federal personnel. My understanding is that the group's goal is to have 800 protesters at the facility at any given time.

22. The agitators have been successful in their attempts to harm officers. More than thirty ERO officers have been injured during the assaults on law enforcement, including a torn ACL, a beard ripped from an officer's face, multiple lacerations, cuts, and bruises, multiple hospitalizations, and a hyper-extended knee from an officer being tackled by a rioter at the legs.

Declaration of Field Office Director Russell Hott

23. Personnel have not been harmed or threatened only at BSSA. At least one ERO officer assigned to the facility was followed to his home, where he was confronted aggressively. The officer was forced to call 911 out of concern for his safety. Roughly ten days later, the same officer's garage was broken into, and his government-owned vehicle was broken into and damaged. The perpetrator was even able to break into the safe in the car and stole the officer's service weapon. More than twenty officers have been doxed, with their home addresses put out on social media, their families threatened, and their personal property damaged. Cartels and the Latin Kings gang have placed $10,000 bounties on the murder of any immigration officer.

24. As BSSA's staff became overwhelmed by this concentrated attack, ERO Chicago took additional steps to directly respond to above-referenced violence. On or about September 8, 2025, ERO Chicago mandated twelve-hour duty shifts for its Special Response Team (SRT) officers. SRT officers and agents are uniquely trained to serve in high-risk situations, such as serving warrants under hazardous conditions, arresting dangerous criminals, and assisting other law enforcement agencies during critical incidents. The addition of SRT officers to control the security risks at BSSA aimed to ensure that the most highly trained officers were safeguarding BSSA, officers, agents, and bystanders from unnecessary and unlawful violence. Among other things, SRT members created paths for ERO vehicles to enter and exit and pushed the crowds away from the building as the rioters threatened violence.

25. On at least twenty-five occasions, ERO Chicago solicited assistance from Homeland Security Investigations (HSI), another component within ICE, to add agents from its SRTs, given the escalating risks.

26. On or about September 17, 2025, ERO Chicago requested additional support from CBP's BORTAC and SRT and HSI SRT in anticipation of a crowd of approximately 800 protesters scheduled for September 19-20, 2025.

27. ERO Chicago also installed high-power, generator-powered lights around the perimeter of BSSA. This allows the officers to better see the areas where protesters commonly gathered, permitting them to respond to any threats before they escalate further.

## Insufficient Response of City and State Officials

28. In the initial days of the protests, when the crowds were still small, the Broadview Police Department (BPD) was onsite and made a small number of arrests. However, after the publication of a news article that criticized this cooperation, alleging violations of, among other things, Illinois's Way Forward Act. BPD did not return.

29. On September 12 and 13, 2025, BSSA contacted both the non-emergency and emergency lines of BPD more than eight times. Among other things, an officer had been attacked, and my tires had been slashed. BPD advised that it had been directed to abstain from responding to any requests from ICE. BPD also advised that it would respond to requests from rioters who contacted 911.

30. Following BPD's disengagement and prior to ICE erecting the fence, there has been no local police assistance in controlling protesters. ERO and Federal partners were solely responsible for addressing the violence outside BSSA, which is in a municipal area. ERO Chicago has arrested approximately fifty rioters and obstructionists for assault, obstruction, trespassing, and other charges. To highlight the danger posed to BSSA personnel by those arrested, on September 26 and 27, 2025, ERO Chicago arrested sixteen protesters, including three with concealed semi-automatic weapons.

**Current Status at BSSA and Impact on ICE Operations**

31. On the night of September 22-23, 2025, after three weeks straight of 24-hours-per day riots, ERO Chicago made a concerted push to move agitators and rioters down the street and away from BSSA facility. ERO Chicago had coordinated with a vender to stand up an anti-climb fence at midnight. Anti-climb fences are designed to prevent unauthorized access by making it difficult to climb. Among other protections, this fence has only small holes. Although they are big enough to see through, they are too small for people to insert fingers in order to climb the fence.

32. This fence is rented and is not a permanent fixture; it can be removed with the proper equipment. No holes have been drilled into the street or sidewalks. Although there is a gate to allow access, the fence does not have to be opened for vehicles to enter or leave the parking lot or facility, as there is an alternate route via Harvard Street.

33. The gate, which is sixteen feet wide, opens in both directions. ICE has personnel at the gate twenty-four hours a day to open the gate in an emergency. The gate takes less than two minutes to open.

34. On multiple occasions, including October 3, 2025, ICE opened the gate to allow an ambulance to enter onto ICE's property. Ambulance drivers have not indicated that the gate created a delay. Pushing through a crowd of violent protesters would have caused a delay, however.

35. ICE and the Fire Department have engaged to discuss the dimensions of the gate.

36. As a result of the fence installation, vehicles are able to move freely in and out of BSSA, using the alternate route. ICE was advised by the Village of Broadview that the fence resulted in a decline of 911 calls for emergency assistance at BSSA. Additionally, the

fence has resulted in a significant decrease in officer injuries as rioters are no longer able to make direct contact with BSSA staff. The fence has reduced the number of rocks, bottles, and other projectiles being hurled at officers. The fence has also received positive support from local business on Beach Street. Some business owners have asked ICE to move the fence to the intersection of Beach Street and Lexington Street to stop the rioters from damaging their businesses and/or disrupting their daily business functions.

37. On Thursday, October 2, Illinois State Police (ISP) established a protest zone and placed concrete barriers on Beach Street public land. In doing so, they created a restricted area, with the fence acting as one boundary. ISP established a Unified Command Center and maintained security at Beach Street, Harvard Street, and South 25th Street on Friday, October 3, 2025.  ISP did not establish a prophylactic response on Saturday, October 4, or Sunday, October 5; however, ISP did respond to ERO Chicago's request for assistance on both days.

**Impact of Plaintiffs' Requested Relief**

38. Should the fence be removed, ICE anticipates that rioters will resume excessively violent and aggressive behavior to impede and obstruct officers. Rioters will once again be free to damage government- and privately owned property. ERO and its Federal partners will be required to increase uses of force in the absence of the Village of Broadview refusing to manage and control the protests according to Broadview's own code. This will include an increase use of less lethal and chemical munitions. Officer injuries will once again increase, and non-law enforcement personnel will be subject to violence and threats of violence. Rioters will once again be close enough to volley Molotov cocktails at BSSA or place additional incendiary devices along the perimeter of BSSA.

39. Nor are only ICE employees at risk. As mentioned above, another business on the street has faced harassment. Aliens being brought in for processing are also at risk. On September 24, 2025, in Dallas, Texas, a sniper fired shots indiscriminately into an ICE van. The murder victims were exclusively detainees in custody. With the consistent attack on vehicles entering and leaving BSSA, rioters could easily harm individuals in ERO custody.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

October 6, 2025

_____
Russell Hott
Field Office Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

The VILLAGE OF BROADVIEW, an Illinois
Municipal Corporation,

     *Plaintiff*,

v.

The U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of the U.S.
Department of Homeland Security; TODD
LYONS, in his official capacity as Acting
Director for U.S. Immigration and Customs
Enforcement; and RUSSELL HOTT, in his
official capacity as the Chicago Field Office
Director for U.S. Immigration and Customs
Enforcement,

     *Defendants*.

No. 1:25-cv-12164

Declaration of Daniel I. Parra

**DECLARATION OF DEPUTY CHIEF PATROL AGENT DANIEL I. PARRA**

I, Daniel I. Parra, declare and affirm as follows:

1. I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol Agents are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with the Constitution and other applicable laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

1

2. I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022.  In this role, I am responsible for managing U.S. Border Patrol operations and administrative functions within the El Centro Sector, which encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line.  I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

3. I entered on duty with the U.S. Border Patrol on July 28, 2002.  My first assignment as a Border Patrol Agent was at the El Centro Station, El Centro Sector.  Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity.  These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief,  U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector.  As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation.

4. My current Role is Incident Commander for the current CBP operation in and around Chicago, Illinois.  In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Chicago area.  Furthermore, I ensure that all personnel under my command have the proper resources, not only in terms of material, but the requisite training needed to operate in such a complex and fluid environment.  As the Incident Commander, I report directly to National Incident Commander Center.

5. On or about [September 16, 2025, to support U.S. Immigration and Customs Enforcement (ICE), CBP agents and officers were deployed to Chicago, Illinois, as part of a national, multi-agency operation.  The operation focuses on enhancing public safety and enforcing immigration law through law enforcement efforts.

6. As part of this operation, CBP officers and agents, in coordination with other federal agencies, along with their federal partners, are involved in a variety of different law enforcement encounters and enforcement actions.  Officers and agents regularly engage in consensual encounters, investigative detentions, lawful warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants.

7. CBP officers and agents routinely use the ICE Broadview Service Station Area (BSSA) facility located at 1930 Beach Street, Broadview, Illinois to process and temporarily house individuals detained under the immigration laws during the ongoing operation.

8. CBP officers and agents, and individuals within their legal custody, have faced escalating hostility and violence from rioters and other individuals in Chicago and nationwide. Individuals and large groups of people have been increasingly willing to threaten CBP personnel, damage government property, and assault agents and officers performing their lawful duties, including at the BSSA facility.

9. Specifically, as Incident Commander, I have experienced and reviewed reports documenting the violent targeting of CBP personnel and government property, interfering with our official law enforcement duties, around the BSSA facility including:

   a. On September 19, 2025, protesters gathered outside of the BSSA and intentionally blocked the path of a Border Patrol vehicle transporting detainees to the facility. ICE agents responded to the scene to deter protestors from obstructing the path of the vehicle and protect the detainees, but the protestors refused to move. As a result, agents deployed less lethal munitions to disperse the obstructing protestors and ensure the safety of agents and detainees.

   b. On September 20, 2025, ICE discovered that rioters slashed the tires of ten government vehicles parked at a General Services Administration parking lot adjacent to the BSSA.

   c. On September 26, 2025, rioters restricted vehicle access to the BSSA by blocking the nearby intersection of 25th Street and Harvard Street requiring the deployment of a specialized Border Patrol Tactical Unit (BORTAC) which was forced to deploy less lethal munitions to disperse the obstructing crowd and allow access to the BSSA. CBP was required to deploy additional Special Response Team (SRT) and Mobile Field Force (MFF) officers to maintain control of the area thereafter as rioters refused to disperse.

   d. On September 27, 2025, rioters yet again impeded CBP vehicles and personnel from entering and exiting the BSSA. As a result, dozens of officers and agents were deployed to allow access to the BSSA. On this occasion, agents arrested 11 individuals. Two arrestees were armed with loaded handguns.

   g. On October 3, 2025, DHS received notice that a five-figure bounty had been placed on a high level CBP law enforcement employee by a Chicago area street

3

gang that called for his or her capture or death. This individual is known to frequent the BSSA facility.

h. At least two rioters at the BSSA were found to have firearms on them when arrested. These individuals were arrested immediately outside the fencing.

10. CBP special operations teams are routinely needed to maintain crowd control in Chicago given the size and activities of the rioters, including at the BSSA. Rioters, masked as protestors, routinely call for demonstrations outside the BSSA facility.

11. State and local public officials have disparaged members of CBP and ICE in press conferences. On October 6, 2025, Chicago Mayor Brandon Johnson, as reported by WGN news, stated, "we have a rogue, reckless group of heavily armed and masked individuals roaming throughout our city that are not accountable to the people of Chicago."[1] Similarly, Illinois Governor JB Pritzker recently stated, "on a beautiful weekend, when families were out enjoying their day in Chicago, armed border patrol agents were downtown, marching up and down Michigan Avenue, harassing and intimidating residents and tourists. Meanwhile, ICE's chief offender Gregory Bovino, has been leading the disruption and causing mayhem while he gleefully poses for photo ops and TikTok videos."[2][3] These statements against CBP and ICE have inflamed animosity towards CBP agents and officers, including those using the BSSA facility.

12. The fencing around the BSSA facility allows for protestors to be around the facility without interfering with law enforcement efforts or compromising the safety of the agents/officers and detainees.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 6th day of October, 2025, at North Chicago, Illinois.

_____

Daniel I. Parra
Deputy Chief Patrol Agent
DHS CBP, El Centro Sector

4